[No. S013552. Aug. 30, 1991.]

RICHARD H. LUBETZKY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

310

**COUNSEL**

Greines, Martin, Stein & Richland and Kent L. Richland for Petitioner.

Diane C. Yu, Starr Babcock, Marie M. Moffat and Robert P. Heyman for Respondent.

**OPINION**

**THE COURT.**—Petitioner was denied admission to practice law after a hearing panel of the State Bar determined that he had "not proven that he is possessed of good moral character" within the meaning of rule X of the Rules Regulating Admission to Practice Law in California. The review department affirmed that ruling without dissent, two members abstaining.

Our review of the entire record persuades us that the evidence does not support the findings of the hearing panel as to petitioner's moral character. We therefore decline to accord those findings any weight. Instead, we conclude in light of our own independent evaluation of the evidence that petitioner presented a strong prima facie case that he is of sufficiently good moral character to be admitted to practice law. Because we are persuaded that the State Bar's evidence failed to rebut that prima facie case, we find that petitioner has sustained his burden of proof on the issue of moral character and direct that he be certified as qualified for admission to practice law.

## I. *Introduction*

By State Bar rule, an applicant for admission to practice "shall have the burden of proving that he or she is possessed of good moral character."[1] "Pursuant to this rule the applicant must initially furnish enough evidence of good moral character to establish a prima facie case, and the [State Bar] then has the opportunity to rebut that showing with evidence of bad character. [Citation.]" (*Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 449-551, fn. 1 [55 Cal.Rptr. 228, 421 P.2d 76] (*Hallinan*); accord, *Hightower* v. *State Bar* (1983) 34 Cal.3d 150, 155 [193 Cal.Rptr. 153, 666 P.2d 10]; *Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730, 734 [159 Cal.Rptr. 848, 602 P.2d 768]; *Bernstein* v. *Committee of Bar Examiners* (1968) 69 Cal.2d 90, 95 [70 Cal.Rptr. 106, 443 P.2d 570].) If the State Bar is unable to rebut the applicant's prima facie case, then the applicant has carried his or her burden of proof. If the State Bar presents sufficient evidence to rebut the prima facie case, then the applicant must introduce further evidence of good moral character or discredit the State Bar's evidence. Although we give "great weight" to the findings of the hearing panel on review, they are not binding on us. "We examine the evidence and make our own determinations as to its sufficiency . . . ." (*Hightower* v. *State Bar, supra*, 34 Cal.3d at pp. 155-156; see also *Kwasnik* v. *State Bar* (1990) 50 Cal.3d 1061, 1068-1069 [269 Cal.Rptr. 749, 791 P.2d 319].)

The charges levelled against petitioner by the State Bar centered on two related matters: (1) an alleged misuse of the judicial process by filing civil suits against former friends for the purpose of harassing them, and (2) the accusation that petitioner was responsible for the mystifying appearance of over one hundred sexually obscene postcards and letters anonymously mailed to Robert Friedman, a former friend of petitioner and his chief accuser at the hearing, and to Friedman's mother, the Friedmans' family

---

[1] Rule X, section 1(a), Rules Regulating Admission to Practice Law in California.

physicians, and an art gallery where Robert Friedman falsely claimed to be employed.

Except for a lawsuit filed by petitioner in 1975 against one Arguimbau, a college classmate and friend with whom he had a falling out, the bulk of the litigation filed by petitioner arose out of his short-lived friendship with Friedman, a relationship that began in 1982 when Friedman began sharing an apartment with Robin Spivack, a friend and former law school classmate of petitioner. The rise and fall of the friendship was punctuated by the appearance of the anonymous mail—beginning with a mildly obscene note to Robin Spivack following her eviction of Friedman from the apartment in the wake of a series of bizarre acts—and gradually became a torrent of sexually explicit postcards, often cobbled together from fragments of newspaper and typescript or handwriting. As a kind of counterpoint to the obscene mail, some of the participants in the affair began to receive annoying hang-up telephone calls—sometimes as many as 20 a day—originating roughly coincidently with the obscene mail. Robin Spivack, petitioner, and Robert Friedman all reported being telephonically harassed.

Apart from one item, little if any of the evidence offered by the State Bar inculpated petitioner as the source of the obscene mail. But that one item was troubling—the tip of a fingerprint discovered on the obverse side of a piece of "scotch" tape used to bind a fragment of newspaper to the face of one of the obscene postcards, a print identified as and conceded to be petitioner's. Other than this item, much of the evidence presented at the hearing pointed to someone else as the figure behind the obscene mail— pointed, in fact, to the principal recipient, Robert Friedman himself. Moreover, the implications of the fingerprint were undercut by a wealth of evidence of bizarre conduct by Friedman, conduct similar to that with which petitioner was charged; by the admission in a secretly recorded telephone conversation that Friedman was responsible for the hang-up calls; and by petitioner's innocent explanation of the fingerprint, supported by expert testimony and demonstrative evidence. Finally, petitioner's authorship of the postcards was not easily reconciled with the considerable evidence of his good character—evidence that he is conscientious, moderate in expression, and seemingly devoted to the welfare of others.

Our independent review of this record convinces us that the State Bar's rebuttal evidence to petitioner's prima facie case is insufficient to sustain the conclusion of the hearing panel that he lacks good moral character.

## II. *The Evidence*

Petitioner's evidence at the moral character hearing established that he graduated *cum laude* from the University of California at Los Angeles

(UCLA) in 1974. While an undergraduate, petitioner was active in consumer affairs; he founded and served as the first director of the university's Consumer Protection Project, co-authored a consumer rights handbook published by the university, and taught a consumer rights course. He received several awards and citations for his work in this area. Following graduation, petitioner worked full time in a law firm as a paralegal and researcher while attending night law school classes from 1975 to 1978. ██ ██ In 1979, he began attending law school full time, graduating in 1980.[2] In 1985, petitioner joined a Southern-California-based consumer group known as CALJUSTICE (an acronym for Consumer Advocates for Legal Justice), an organization seeking reform of the attorney disciplinary process, including its removal from the hands of the State Bar. According to evidence in the record, petitioner has been a visible advocate for change in the attorney disciplinary system, having served as board chair and president of CALJUSTICE since 1986 and having appeared on behalf of that organization before several state legislative committees, the State Bar Board of Governors, and other forums in support of attorney disciplinary reform. Petitioner has contributed these efforts on behalf of the organization on an uncompensated, volunteer basis.

In support of his good character, petitioner presented testimony, declarations, and letters of support from several persons—three attorneys, a state senator, colleagues in the consumer protection movement, former teachers and college administrators, schoolmates and neighbors—attesting to his good moral character. All offered unqualified praise of petitioner, including his honesty, integrity, reliability and altruistic nature. These included the former president and cofounder of CALJUSTICE (who described petitioner as "the finest human being I ever met" and "beyond reproach"); an attorney active in discipline reform who formerly served on the State Bar's Public Protection Committee (who stated, "If I wanted to see somebody be an attorney, it would be [petitioner] because of his integrity"); an attorney who had represented petitioner in past litigation (who described petitioner as "honest to the spirit, not only the letter, of what he says" and who "wish[ed] there were more attorneys out there with [petitioner's] moral character"); another attorney for whom petitioner had worked as a paralegal and researcher (who thought petitioner "would make an excellent attorney"); and

---

[2]Between 1980 and 1987, petitioner took the California Bar Examination 13 times before passing in June 1987. In other words, except for 1985, applicant took the bar examination every time it was offered for six years. This may be a record, but of course it is not fatal or even relevant to the decision whether petitioner should be denied admission to practice on moral character grounds. (Cf. *Hightower* v. *State Bar, supra*, 34 Cal.3d at p. 153 [applicant who had taken bar seven times ordered admitted over claims of misconduct].)

other law graduates and friends of petitioner who testified along similar lines. ██ In short, petitioner met his threshold burden of demonstrating prima facie his good moral character.[3]

The State Bar's case-in-rebuttal proceeded along three lines, all of which —together with a fourth—were adopted and relied upon by the hearing panel. Before taking up the chief issue—the central puzzle of the obscene mail—we consider the three other grounds relied on by the hearing panel.[4] The panel determined that: (1) litigation commenced by petitioner in the past indicated, in its words, "a pattern of harassment on the part of petitioner in using the courts and the judicial process for personal reasons"; (2) petitioner omitted from his bar examination application certain litigation in which he had participated until notified of the omission by State Bar officials; and (3) petitioner showed a "lack of respect for the law and for the legal canons of ethics" by tape-recording two telephone conversations with Robert Friedman without Friedman's knowledge or consent. As we shall see, all three grounds are questionable; none standing alone would suffice to establish petitioner's bad moral character; and together they fail to rebut petitioner's prima facie case of good moral character.

## A.

*The "pattern" of litigation harassment.* In its decision, the hearing panel noted that a defamation action filed by petitioner against Robert Friedman and others was dismissed by the trial court on privilege grounds, a result upheld by the Court of Appeal.[5] The panel then recounted petitioner's small

---

[3]Our decisions in admission cases accord "significant weight" in making a prima facie case to testimonials from attorneys on an applicant's behalf. (*Kwasnik* v. *State Bar, supra,* 50 Cal.3d at p. 1068; see also *Pacheco* v. *State Bar* (1987) 43 Cal.3d 1041, 1053 [239 Cal.Rptr. 897, 741 P.2d 1138]; *Greene* v. *Committee of Bar Examiners* (1971) 4 Cal.3d 189, 192 [93 Cal.Rptr. 24, 480 P.2d 976]; *Bernstein* v. *Committee of Bar Examiners, supra,* 69 Cal.2d at p. 96; *Hallinan, supra,* 65 Cal.2d at p. 453.)

[4]The hearing panel in this case consisted of two members, a volunteer attorney and a public (nonattorney) panelist. A third panelist—the principal referee—resigned before the hearings were completed and did not participate in the decision.

[5]The bulk of the litigation in which petitioner had participated consisted of two core suits and satellite proceedings. In 1975, petitioner filed a defamation action against Arguimbau. The case was settled, Arguimbau agreeing to pay a small sum as part of the settlement agreement and executing a promissory note; petitioner later successfully filed suit to enforce the note. The so-called Friedman litigation began in 1983 and eventually encompassed three suits—an action to restrain Robert Friedman from physically interfering with petitioner; a second suit against Friedman, his parents and others for defamation and related claims arising out of the postcard incidents and allegations that petitioner was responsible for the mailings; and an ancillary small claims proceeding against a friend of Friedman for damages and a statutory fine following her failure to attend a deposition in the second Friedman action. In

claims proceeding against one of Friedman's codefendants in the defamation action, in which petitioner had sought damages and a statutory fine following the codefendant's failure to attend a noticed deposition—including petitioner's subsequent (and unsuccessful) petition to the superior court seeking review of the adverse small claims ruling.[6]

To the hearing panel, petitioner's conduct in these two matters bore similarities to the 1975 defamation action against his former friend, Arguimbau. And despite recognition of the fact that petitioner was represented by counsel in all but the small claims proceeding and that 13 years had passed since the first suit was instituted, it "seemed" to the panel that these lawsuits "showed a pattern of harassment on the part of [petitioner] in using the Courts and the judicial process for personal reasons." The panel failed altogether, however, to identify the similarities between the 1975 and the 1983 lawsuits on which it relied. In addition, its conclusion on this point suffers from a lamentable absence of precision. The panel did not specifically find a pattern of harassment in petitioner's use of the courts—it only concluded that one "seemed" to exist. Nor did it purport to find that any of the actions lacked merit or were brought for an improper purpose.

In analogous areas, we have required a heightened showing of misconduct by a litigant or attorney as a condition of penalizing resort to the judicial process. In *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179], we formulated a strict standard for imposing sanctions for prosecuting frivolous appeals—defined to include those taken to harass an opponent—noting that sanctions "should be used most sparingly to deter only the most egregious conduct." (*Id.* at p. 651.) In *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863 [254 Cal.Rptr. 336, 765 P.2d 498], we adopted a modified *Flaherty* standard—"whether any reasonable attorney would have thought the claim tenable"—as the standard under which the probable cause element of malicious prosecution actions is to be tested. As in *Flaherty*, we were motivated in part by a concern to avoid "a serious chilling effect on the assertion of litigants' rights [of access]." (*Id.* at p. 885, *quoting Flaherty, supra,* 31 Cal.3d at p. 650.)

---

addition, petitioner had filed an action against the University of California (in which the Regents were the nominal defendants) seeking to have corrected certain of his records while a student at UCLA. The record in that proceeding was ordered sealed by the superior court.

In finding a pattern of harassment, the hearing panel relied only on the Arguimbau suit and the Friedman litigation.

[6] In the small claims action, petitioner proceeded under Code of Civil Procedure section 1992, which provides: "A witness disobeying a subpoena also forfeits to the party aggrieved the sum of five hundred dollars ($500), and all damages which he may sustain by the failure of the witness to attend, which forfeiture and damages may be recovered in a civil action."

Given these expressed concerns, we are reluctant to credit so tentative a finding of moral turpitude based on undisclosed grounds as that reached by the hearing panel in this case. Especially where important policies favoring unfettered access to the courts are implicated, a more carefully articulated assessment of the evidence, leading to precisely formulated findings, is demanded. We therefore decline to adopt the findings of the hearing panel with respect to this charge against petitioner.

■ Turning to the record itself and evaluating the evidence independently, we conclude that it falls short of sustaining a determination that petitioner's resort to the courts discloses a pattern of groundless litigation designed to harass others. At the outset, we are unpersuaded that the Arguimbau suit shares sufficient similarities with the Friedman litigation to constitute a "pattern." True, both were defamation actions brought against former friends of petitioner after a falling out. Beyond that, however, the similarities end.

More importantly, we find little in the record to warrant a conclusion that any of the lawsuits on which the hearing panel relied qualify as frivolous. As noted, in all of these proceedings except the small claims action, petitioner was represented by counsel. Each of the lawyers who represented petitioner in the Arguimbau and Friedman lawsuits appeared at the hearing and testified that in counsel's opinion the suit had merit; petitioner obtained a favorable settlement in the Arguimbau matter, the small claims action was authorized by statute, and the authority upon which petitioner's defamation complaint against the Friedmans was dismissed was subsequently questioned by another division of the Court of Appeal.[7]

Although the lawsuits do petitioner no particular credit, neither do they reveal anything more than a trait for combativeness that many clients expect in lawyers. It is true that the Friedman litigation appears to have been aggressively pursued by petitioner, but the case was aggressively fought by the attorney for the Friedmans—as petitioner's former litigation attorney

---

[7]The record indicates that the Friedman defamation action was dismissed on the ground that an allegedly false police report concerning petitioner made by the Friedmans was absolutely privileged under former Civil Code section 47, subdivision 2, a ruling which the Court of Appeal affirmed, relying on *Williams v. Taylor* (1982) 129 Cal.App.3d 745 [181 Cal.Rptr. 423]. Petitioner's litigation attorney in the Friedman case testified at the hearing that as a result of the Court of Appeal's ruling, he wrote a law review article arguing the case for a contrary rule of qualified privilege. Another division of the Court of Appeal has recently adopted such a view, citing with approval counsel's law review article. (See *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476, 1482, fn. 8 [273 Cal.Rptr. 367] [citing Ablon, *Williams v. Taylor: Communications to Police with Absolute Immunity: Revenge Courtesy of Civil Code Section 47(2)* (1986) 18 U. West L.A. L.Rev. 51].) Although we express no opinion on the merits of the controversy, this account is a forceful reminder of "the evolutionary potential of legal principles." (*Sheldon Appel Co. v. Albert & Oliker, supra,* 47 Cal.3d at p. 886.)

testified. The record, moreover, suggests that petitioner believed his standing as a consumer advocate and would-be attorney might be jeopardized if the Friedmans' allegations were permitted to go unchallenged. In short, the record does not disclose any basis upon which we can reasonably conclude that the lawsuits were improper, especially when evaluated in light of the maxim that all reasonable doubts in admission proceedings are to be resolved in favor of the applicant.[8]

We have previously found an applicant's participation in five lawsuits to be so "relatively insignificant" as to merit no more than a footnote. (*Hall* v. *Committee of Bar Examiners, supra,* 25 Cal.3d 730, 733, fn. 2.) Standing alone, these incidents are insufficient to sustain a finding of bad moral character. (Cf. *Hallinan, supra,* 65 Cal.2d at p. 464 et seq. [repeated fistfights insufficient to support exclusion].)

### B.

*Omissions in bar examination applications.* Under this heading, the hearing panel found that petitioner failed to list on his bar examination applications the Friedman lawsuits and the action against the Regents until these omissions were brought to his attention by the State Bar. Petitioner's explanation was that he had submitted a complete list of litigation in his original "long form" application in 1980, the first time he took the bar examination; that he had subsequently filed "short form" applications each time he took the bar examination; that he had failed to disclose the Friedman litigation under the mistaken belief that he had included it in one of the previous short form applications he submitted (he filed 12 such forms over the years); and that he had not listed the Regents suit after being advised by a State Bar official that he need not include a matter ordered sealed by the court. It is undisputed that on passing the bar examination and being asked by the State Bar to submit an updated long-form application, petitioner did so in 1988, disclosing all of the litigation in which he had been involved, including the Regents matter, and that this disclosure occurred before petitioner was notified that the State Bar intended to institute moral character proceedings against him.

The hearing panel found petitioner's explanation that he had overlooked the Friedman litigation unconvincing "because [petitioner] appeared to be

---

[8]The hearing panel's conclusion that petitioner used the courts for "personal reasons" is also puzzling. The bulk of civil proceedings brought by individuals would qualify for reprimand under this rubric. Although inartfully phrased, we surmise that the thrust of the panel's finding is that the two lawsuits filed by petitioner against erstwhile friends demonstrated a practice of harassing others by bringing groundless litigation. This is simply another way of asserting that petitioner's claims were meritless, a conclusion we consider and reject in the main text.

otherwise meticulous in dealing with details." We are not informed by its decision, however, what the panel made of these omissions—it made no finding that they constituted acts of moral turpitude. Presumably the panel inferred that petitioner's failure to disclose the lawsuits until asked by the State Bar to submit an updated long-form application was accompanied by an intention to conceal the fact of the litigation from the State Bar.

The evidence, however, undermines such an inference. It discloses correspondence in 1986 between petitioner, the State Bar, and the Friedmans' attorney in which petitioner noted the restraining order he had obtained against Robert Friedman and his subsequent defamation action against the Friedman family. The record includes a reply from the State Bar's executive director inviting petitioner to provide any additional information regarding the Friedman litigation and the underlying controversy when he had passed the bar examination. Thus, in 1986 petitioner certainly knew that the State Bar was aware of the Friedman litigation since he had discussed it with them in correspondence. He would thus have had no discernible reason to fail to disclose the litigation in his application in the hope of concealing it from the State Bar.

■ We have distinguished between affirmative misstatements intended to place an applicant at an advantage and the unintentional nondisclosure of information which, under the circumstances, is not morally significant. (*Hallinan, supra,* 65 Cal.2d at p. 473 [failure to disclose arrests de minimus in light of disclosure of several other arrests]; *Greene v. Committee of Bar Examiners, supra,* 4 Cal.3d 189, 194 [unintentional failure to disclose prior bar examination applications and prior law school attendance not grounds for exclusion].) Given the circumstances of record, notably the absence of any apparent motive on the part of petitioner to lie about the matter, the failure to include the litigation appears to us to qualify as the sort of "unintentional nondisclosure of a relatively unimportant matter" which does not justify exclusion from the bar. (*Greene, supra,* at p. 194.)

## C.

*Unconsented taping of telephone conversations.* As part of an effort to impeach Robert Friedman's testimony, petitioner's counsel offered into evidence a cassette recording of two telephone conversations between petitioner and Friedman during which they discussed the obscene mail, the hang-up calls, and related matters. These conversations were tape-recorded by petitioner without Friedman's knowledge. Their contents are unquestionably probative on the issue of Friedman's role in the postcard affair—they inculpate Robert Friedman as the source of the hang-up calls and establish

that he invented the names of two fictitious Los Angeles art galleries that he said had received obscene postcards.[9]

According to petitioner, Friedman had admitted to him that he (Friedman) was responsible for the hang-up calls, but had threatened to blame petitioner for them if denounced. Petitioner further testified that before deciding to make the recordings, he researched the legal aspects of the unconsented recording of telephone calls, checked with a police detective investigating the Friedman matter and a county prosecutor (both of whom, he testified, advised him of its legality under certain circumstances), and concluded that a recording of a telephone conversation with Friedman without his knowledge, if undertaken with certain safeguards, would not be unlawful under the circumstances.

▮ Rather than assess the substantive evidential value of the content of the cassette recordings in assisting it in resolving the pivotal issue in the case, the hearing panel instead seized on the fact that the tape recordings were made without Friedman's knowledge as an additional basis on which to fault petitioner's character.[10] It ruled that the making of the cassette revealed another character defect—a "lack of respect for the law"—and furnished an additional ground on which to deny petitioner admission.

Of all the evidentiary uses to which the tape recordings and their contents might have been put, the hearing panel's seems the most dubious.[11] Accept-

---

[9]Friedman admits in one tape recording to making hang-up calls to Robin Spivack, his former roommate. This was corroborated by telephone records admitted into evidence. The admission is relevant to the question of who mailed the obscene postcards in light of a consistent link between the two; hang-up calls and anonymous mailings began almost simultaneously after Spivack evicted Friedman from the apartment the two had shared, and several of those who received obscene mail also received hang-up calls. In addition, there was evidence that Friedman had left obscene messages on petitioner's telephone answering machine, the contents of which were similar to messages on some of the postcards. Thus, a finding that Friedman was the source of the hang-up calls would lay the groundwork for an inference that petitioner was not the author of the postcards.

In addition, Friedman's portrayal of himself as a victim of an obscene mail campaign is undercut by proof that he fabricated the names of two nonexistent galleries he said had received obscene mail addressed to him.

[10]So explosive were the contents of the tape recordings that Robert Friedman threatened to leave the witness stand and the hearing room if the panel permitted the tape to be played. The panel declined petitioner's request to permit the tape to be played and Friedman to be cross-examined as to its contents. It did admit into evidence transcripts of the two taped conversations.

[11]Petitioner challenges the hearing panel's findings based on the cassette recordings, on due process grounds, arising from the lack of notice that his conduct in making the tapes would form the basis for a separate finding of bad moral character. (See *Rose* v. *State Bar* (1989) 49 Cal.3d 646 [262 Cal.Rptr. 702, 779 P.2d 761]; *Gendron* v. *State Bar* (1983) 35 Cal.3d 409

ing as reasonable petitioner's uncontradicted testimony that he believed that Friedman was himself the source of the hang-up calls, the taping episode falls within an exception to the general statutory criminalization of unconsented telephone recordings. Although Penal Code section 632 makes the recording of a confidential telephone conversation without the consent of all parties a criminal offense, Penal Code section 633.5 exempts from the sweep of the statute an undisclosed recording by one of the parties of a conversation "reasonably believed to relate to the commission by another party [to the conversation] of [certain enumerated crimes] . . . or a violation of section 653m." Penal Code former section 653m, subdivision (b), in turn, made it a misdemeanor to telephone anyone "with intent to annoy . . . and without disclosing [the caller's] identity . . . whether or not conversation ensues . . . ."

Several decisions of the Court of Appeal have examined the relationship between Penal Code sections 632 and 633.5. All have concluded—correctly —that the latter exempts from the former an unconsented recording made with the requisite reasonable belief although the recording fails to capture the anticipated evidence (*People* v. *Parra* (1985) 165 Cal.App.3d 874, 880-881 [212 Cal.Rptr. 53]) or the initial purpose of the recording is self-protection rather than to gather evidence for use in a criminal prosecution (*People* v. *Ayers* (1975) 51 Cal.App.3d 370, 377 [124 Cal.Rptr. 283]). (See also *People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 731 [132 Cal.Rptr. 558]; *People* v. *Strohl* (1976) 57 Cal.App.3d 347 [129 Cal.Rptr. 224].) In light of our conclusion that the tape recordings were made by petitioner under the reasonable belief that the conversations with Friedman would relate to hang-up calls, the evidence fails to support a finding of moral turpitude with respect to these incidents.[12]

---

[197 Cal.Rptr. 590, 673 P.2d 260]; *Woodard* v. *State Bar* (1940) 16 Cal.2d 755 [108 P.2d 407].) We do not reach the issue in light of our conclusions that petitioner's conduct fell within the exception of Penal Code section 633.5 and that the circumstances under which the tape recordings were made do not show bad moral character.

[12]In its brief, the State Bar disclaims any reliance on what it terms the hearing panel's "gratuitous reference" to the tape recordings as a ground for the panel's conclusion regarding petitioner's moral character. The use of the tapes is not so easily dismissed, however. Its opinion plainly discloses that the hearing panel regarded the finding that petitioner had violated a criminal statute as "further evidence," as the panel put it, of petitioner's "lack of respect for the law," a matter it felt "impelled to raise" on its own even though the State Bar's charges against petitioner did not include the taping episodes.

The tape recordings and the findings regarding their making were thus integral to the panel's overall assessment of petitioner's character as one who "broke the law" in the very process of seeking to demonstrate his moral fitness to practice. Although we cannot say to what extent the conclusion that petitioner violated a criminal statute under such circumstances affected the panel's evaluation of the evidence surrounding the charges against him, we are

## D.

■ *The obscene mail.* This brings us to what, by any account of the matter, is the hinge of the case: the charge that petitioner authored and mailed literally scores of obscene postcards to Robert Friedman and others. As noted, petitioner's defense to this charge was that Friedman, the State Bar's chief witness, was himself the offender and had framed petitioner, acting out of a combination of vindictiveness and a need for attention.

On a cold record, Friedman is not a convincing witness. The hearing panel itself conceded that his testimony was substantially "impeached and discredited." The State Bar admitted as much in its brief before the review department. Witness after witness testified to Friedman's bizarre behavior, and much of the evidence pointed to him as the source of the hang-up calls, including his own admission in one of the recorded telephone conversations. Other testimony suggested that his modus operandi included the use of anonymous postcards and obscene telephone messages; one witness testified convincingly to circumstances suggesting that Friedman had contrived to frame her by making it appear (falsely) that she was responsible for painting obscene graffiti on the wall of a building in which she and Friedman had apartments.

Yet even in the face of the admission by Friedman that he was the source of the hang-up calls, other evidence that he had lied under oath, and the hearing panel's own conclusion that his credibility had been destroyed, the panel found that Friedman "did not appear capable of composing [an] obscene post card," and found it incredible that he could have mailed obscene material to his mother.[13]

Absent the evidence of petitioner's fingerprint, it is unlikely that the hearing panel would have concluded that the State Bar's case-in-rebuttal on the postcard charge had been made out; indeed, it is unlikely that moral character proceedings would have been brought against petitioner at all. It is easy—and tempting in the face of a record as dauntingly ambiguous as this one—to make too much of the fingerprint evidence, to make it, in the words

---

persuaded that it must have had a powerful effect on the panel's estimate of petitioner's character; we cannot simply ignore it, as the State Bar implicitly asks us to do.

[13]The first conclusion appears rooted in the testimony of Friedman's mother that her son suffered from a learning disability; it was undermined, however, by the testimony of a former roommate of Friedman and by the expert testimony of a handwriting analyst. The second conclusion is perhaps simply a blind refusal to pursue the dynamics of Friedman's personality to their conclusion; certainly there is nothing inherently "incredible"—in the sense that it can be ruled out a priori—in the idea.

of the State Bar, the "smoking gun" inculpating petitioner irrefutably.[14] The significance of this almost theatrical piece of physical evidence, however, must be evaluated in the context of the entire case.

Petitioner's explanation of the appearance of his fingerprint on one of the cards was, again, that Friedman had framed him, either by showing him the postcard before it was mailed, by arranging to obtain a piece of tape from petitioner bearing his fingerprint, or by retrieving the card from the addressee (a Los Angeles art gallery with which Friedman had a family connection) and then showing it to petitioner. Petitioner offered expert testimony to make this account plausible, including the results of a microscopic examination of the postcard by a questioned documents analyst. The expert testified that his examination revealed the presence of debris beneath the tape, damage to one of the taped corners of the card, newsprint on the tape mucilage, and a "double" print image—all features consistent with the conclusion that the tape had at some time been lifted.[15]

In addition, petitioner offered demonstrative evidence to support his theory. This consisted of expert testimony and the physical results of an experimental replication of the process by which, in examining the postcard, tape, and newsprint, the telltale print might have been deposited. The expert's testimony and the demonstrative evidence at least show the plausibility of petitioner's theory. That is, the evidence demonstrates that the postcard could have been examined in the manner described by petitioner, and that such an examination could have left a fingerprint like the one on the actual postcard without leaving evidence of tampering visible to the unaided eye.[16]

The hearing panel, however, assessed neither the probative value of the expert's findings of physical evidence of tampering nor the effect of the experimental results on the question whether petitioner sent the postcards.

[14]The State Bar's questioned documents expert testified that she examined between 75 and 80 of the postcards and developed 49 prints; only one was petitioner's.

[15]If credited, this evidence would support petitioner's testimony that he had at some point inspected the postcard and, examining it in an attempt to determine if any clue to its origin could be gleaned from the newsprint taped to it, had lifted the tape with the tip of his index finger, leaving the telltale print. Petitioner testified that he and Friedman sometimes exchanged postcards each had received in the mail and discussed them in an attempt to ferret out their source. Although petitioner admitted that he could not specifically recall examining the card bearing his fingerprint, he testified that it was typical of those Friedman had shown him that had scraps of newspaper taped to them, and that he had examined these specimens in the hope of identifying the sender.

[16]The State Bar offered the testimony of its own expert—who originally identified petitioner's fingerprint on the postcard—to refute the account of petitioner's analyst. She testified that she observed no evidence of tampering with the tape or newsprint. She admitted, however, that her original examination of the postcard had been made to identify the fingerprint, and had not been conducted with petitioner's theory in mind; her subsequent examination— undertaken to disprove petitioner's theory—had consisted of an unaided visual examination.

Instead, it rejected petitioner's account on the ground that, had Friedman shown him the card before mailing it, petitioner would have noticed that it bore no postmark.[17] Given the state of the record, however, this manner of assessing the evidence was short of satisfactory.

It is true that someone scrutinizing a postal item for clues to its origin might be expected to notice the absence of a cancellation mark. But it is also not uncommon to receive items in the mail bearing neither a cancellation nor other evidence of mailing. Although probative on the issue of who was responsible for the mailings, the fact that petitioner did not notice the absence of a postal cancellation[18] is not, as the hearing panel seems to have reasoned, conclusive on the question. We are not convinced that the failure to observe that the postcard bore no cancellation ipso facto discredited petitioner's explanation of the fingerprint, and led inexorably to the conclusion that petitioner was responsible for the mailings. At the least, the hearing panel should have provided some account of the substantial evidence pointing to the opposite conclusion.

Apart from the fingerprint, there is virtually no evidence to inculpate petitioner as the author of the obscene mail; indeed, as noted, there is much evidence in the record pointing to someone else. It is not, of course, the province of the fact finder in this proceeding to determine who was responsible *vel non* for the obscene mail; it is enough that our independent review of the entire record leaves us with reservations short of being persuaded that petitioner was responsible for the obscene mail. That charge not being sustained by the evidence, and the remaining allegations against petitioner either being likewise unsustained or, where sustained, not being evidence of bad moral character, we conclude that the State Bar's case-in-rebuttal failed to rebut petitioner's prima facie case of good moral character.

### III. Conclusion

It is ordered that the Committee of Bar Examiners certify petitioner Richard H. Lubetzky to this court as a person qualified to be admitted to practice law.

---

[17]The panel also rejected petitioner's alternative theory that Friedman might have retrieved the postcard from the gallery to which it was mailed and then showed it to petitioner.

[18]Or more precisely, petitioner did not testify, some six years after the event, to having examined a specific postcard and to having noticed the absence of a cancellation stamp. Petitioner's testimony was vague as to his recollections surrounding the postcard. This is not surprising given the passage of six years; a less equivocal recollection might have been less convincing.

Our order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)