[No. S038139. Dec. 4, 1995.]

In re JOSEPH MENNA on Admission.

**COUNSEL**

Diane C. Yu, Richard J. Zanassi, Starr Babcock and Jill A. Sperber for Petitioner.

John A. Mitchell for Respondent.

## OPINION

**THE COURT.**—Joseph Menna (hereafter applicant) is permanently disbarred from the practice of law in New Jersey as a result of his felony convictions for theft of client funds, failure to file a state income tax return, and manufacture of methamphetamine.

Subsequent to his disbarment, he moved to California, passed the bar examination, and sought admission to the State Bar. After a preliminary investigation, the Committee of Bar Examiners (hereafter referred to occasionally as Committee) declined to recommend him for admission and referred the matter for a formal hearing before the State Bar Court. Following an evidentiary hearing, the Hearing Department of the State Bar Court determined he possessed the requisite good moral character to be certified to this court for admission. The Review Department of the State Bar Court affirmed. Pursuant to California Rules of Court, rule 952.6, the Committee of Bar Examiners petitioned this court. We granted review and now reverse on the grounds that determination is not supported by the weight of the evidence; nor is it appropriate in light of the record as a whole. (Cal. Rules of Court, rule 954(a).)

### FACTS

1. *Misconduct leading to disbarment*

As summarized by the hearing department, applicant has "a significant background of compulsive gambling and excessive use of alcohol" and "an extensive history of professional misconduct, which led to his permanent disbarment in New Jersey in 1984" as well as four felony convictions.

Applicant's troubles began soon after his admission to the State Bar of New Jersey in December 1976. Following a short stint with the Camden County Prosecutor's office, he joined the law office of Joseph Maressa, handling personal injury litigation before leaving in 1980 to begin a solo practice, which lasted until August 1982. Through a client of the Maressa firm that held its organizational meetings in Atlantic City, applicant was introduced to the various casinos there and soon began to gamble compulsively. He also started to drink heavily while gambling and experimented with cocaine to remain alert. At the same time, applicant experienced marital difficulties exacerbated by his frequent forays to the casinos.

Beginning in 1980, applicant began to use funds from his client trust account to pay gambling debts. Over a two-year period, he cashed nineteen

separate client settlement checks totaling over $98,000 for his own purposes. In addition, in 1979 he borrowed $70,000 from a former client, Mrs. Cruice, ostensibly to start up a practice but in reality to pay gambling losses. He made payments on the loan until 1982. That year, he also persuaded Mrs. Cruice to cosign a bank note to himself in the amount of $50,000. When the note came due in the summer of 1982, applicant defaulted. As a result, Mrs. Cruice filed an ethics complaint with the New Jersey bar. This complaint led to an investigation of applicant and his temporary suspension for irregularities in the handling of his trust account. (Mrs. Cruice eventually received a $25,000 settlement from the Maressa firm for negligent supervision of applicant.)

During this period of suspension, applicant devised a scheme to pay off his gambling debts by manufacturing illegal drugs. He acquired the necessary precursors to produce methamphetamine, but a former client, who was supposed to buy the finished product, informed the police of the plan. Applicant was arrested, indicted, and ultimately pled guilty to one count of manufacturing methamphetamine. He also admitted to one count of wilful failure to file a 1981 New Jersey state income tax return and two counts of theft by failure to make disposition of property received, which related to two separate instances of misappropriation of client trust funds totaling nearly $75,000.

In November 1984, applicant was sentenced to four years' imprisonment. He remained incarcerated in a minimum security correctional facility until April 1985, and thereafter stayed at a halfway house until September 1985. He successfully completed parole in the spring of 1987. In May 1985, with New Jersey State Bar disciplinary proceedings pending, he consented to permanent disbarment, which applicant acknowledges precludes ever seeking reinstatement there.

In February 1989, applicant moved to Southern California for the purpose of eventually obtaining admission to practice law in this state. In July 1990, he passed the California Bar Examination. After a preliminary examination, the Committee of Bar Examiners notified applicant it had determined not to recommend his admission to this court and had referred his application to the office of Chief Trial Counsel for a formal hearing before the State Bar Court. (Rules Regulating Admission to Practice Law, rule X [Deering's Cal. Rules of Court (State Bar) (1988 ed., 1995 cum. supp.) pp. 144-148].)[1] As noted earlier, the Hearing Department of the State Bar Court, after several days of

---

[1]Rule X, section 102(a), of the Rules Regulating Admission to Practice Law formerly provided that those applicants found by the Committee to possess good moral character would be certified and all others would be referred to the Department of Trial Counsel of the State

hearings in August 1992, issued a written decision holding that applicant possessed the requisite good moral character for admission to the bar. The Office of Chief Trial Counsel, acting on behalf of the Committee of Bar Examiners, requested review. The Review Department of the State Bar Court issued a written opinion affirming the decision of the hearing department as well as a supplemental opinion denying the Committee's motion for reconsideration.

### 2. *Evidence of rehabilitation*

In May 1983, while the aforementioned criminal and disciplinary charges against applicant were pending, he entered the Carrier Foundation Hospital, a psychiatric hospital in Princeton, New Jersey, specializing in compulsive behavior. While there, he was exposed to Gamblers Anonymous, an organization similar in structure and philosophy to Alcoholics Anonymous. Applicant has continuously attended at least one Gamblers Anonymous meeting weekly since leaving the Carrier clinic in 1983. While incarcerated, he organized and led a weekly meeting at the correctional facility. He has served as secretary of his Gamblers Anonymous room in Solano Beach, California, and has participated in seminars and workshops throughout California and New Jersey on compulsive gambling. Applicant has not gambled since 1982.

Two psychologists appeared on applicant's behalf. Dr. Durand F. Jacobs, an authority on addictive behaviors, had counseled applicant during the year prior to the hearing. Dr. Jacobs testified applicant had completely overcome the problems that led to his compulsive gambling and is no more at risk of repeating his earlier misconduct than any other practicing attorney. Dr. Clifford S. Marks was applicant's current therapist. In his opinion, applicant had fully recovered from his gambling addiction and would not regress. Dr. Marks believed applicant now possesses a high ability to handle stress and is of good moral character.

Applicant also presented 29 character reference letters attesting to his good moral character and unblemished record since release from prison. Knowing of the facts leading to applicant's conviction and disbarment, they nevertheless uniformly recommended his admission to the bar. These letters included five from California attorneys with whom he had worked as a paralegal. Each attested to applicant's skill and professionalism and recommended his admission without reservation. One of the attorneys, Michael Bruno, stated he had known applicant for two and one-half years and had

---

Bar for a formal hearing. The rule has been amended to require an appeal to the State Bar Court by the applicant. (Rules Regulating Admission to the Practice of Law, rule X, § 5.)

employed him for part of that time as a legal assistant. They had worked particularly closely on one litigation matter in Northern California for over three months, during which time applicant had provided invaluable assistance and "demonstrated exemplary ethical standards." In addition, letters were received from an engineer who had worked for a small construction company formed by applicant following his release from prison, a Pennsylvania attorney who had known him for 7 years, a New Jersey certified public accountant and ordained deacon in the Roman Catholic Church who had known him for 12 years, a friend of 29 years, and applicant's sister. Each attested to applicant's complete rehabilitation and supported his admission to the bar.

Applicant called a number of additional witnesses to appear on his behalf, including four California attorneys for whom he had worked as a legal assistant. (One of the witnesses, Attorney Michael Bruno, also submitted the character reference letter referred to above.) Although fully aware of applicant's prior misconduct, convictions and disbarment, these attorneys attested to his professionalism and honesty and recommended his admission without reservation. Attorney McKenzie stated applicant was "very guilt-ridden" about his past and his financial debts to his former clients "weigh[] very heavily on him." Attorney Mills indicated applicant had expressed remorse for his misconduct and an interest in working for the poor "to pay something back to society." Two fellow members of Gamblers Anonymous also testified, and some fifteen additional members submitted letters describing applicant's extensive participation in Gamblers Anonymous and his efforts to help others confront and overcome their compulsive gambling and related problems.

Applicant testified in his own behalf. He provided background about his family, formative years, and education in Pennsylvania; his legal experience after graduating from law school; and the events leading to his criminal convictions and disbarment. He described his life since his release from prison: In 1985 he founded and operated a construction company until it went out of business in 1988. In September 1989, he moved to California with the intent to sit for the State Bar examination and apply for admission to practice. Since that time, he has worked as a legal assistant for several attorneys in Southern California. Applicant detailed his extensive involvement in Gamblers Anonymous both as a member and an officer of his local branch. He expressed "extreme sorrow" for the people he harmed in New Jersey and the injury he caused the bar of that state. He believed himself fully rehabilitated from his gambling addiction and hoped to obtain a second chance to be a "productive member of society" by providing assistance to those who "need help in the legal system."

. Applicant's efforts to reimburse the clients he defrauded have been minimal. After his release from prison, applicant made some initial efforts to contact Mrs. Cruice and the Maressa law firm, and made several installment payments to the bank that had reimbursed the New Jersey Client Security Fund for his misappropriation of client funds. These ceased when he left the state. The hearing department found applicant had "failed to make a sufficient showing of an inability to make at least partial restitution, or an objectively verifiable effort to make restitution reasonably related to his ability to pay." Applicant stipulated that at the time of the hearing he still owed $121,750 to the Midatlantic Bank, $25,000 to the Maressa law firm, and $95,000 to his former client, Mrs. Cruice. All these debts were discharged by applicant's chapter 7 bankruptcy petition in 1984, although he affirmed his "intention to make restitution on these debts." It was further stipulated that as of July 1992, applicant still owed the Internal Revenue Service about $535,000 in tax liabilities and penalties.

DISCUSSION

### 1. *Standards on review*

██ "This court may admit to the practice of law any applicant whose qualifications have been certified to it by the Committee of Bar Examiners." (*Kwasnik* v. *State Bar* (1990) 50 Cal.3d 1061, 1067 [269 Cal.Rptr. 749, 791 P.2d 319]; see Bus. & Prof. Code, § 6064 ["Upon certification by the examining committee that the applicant has fulfilled the requirements for admission to practice law, the Supreme Court may admit such applicant as an attorney at law in all the courts of this State and may direct an order to be entered upon its records to that effect."].) To qualify, an applicant must, among other things, demonstrate he or she is possessed of "good moral character." (Rules Regulating the Admission to Practice Law, rule X, § 1; Bus. & Prof. Code, § 6060, subd. (b); *Lubetzky* v. *State Bar* (1991) 54 Cal.3d 308, 312 [285 Cal.Rptr. 268, 815 P.2d 341]; *Kwasnik* v. *State Bar, supra,* 50 Cal.3d at p. 1067.)

"Good moral character" has traditionally been defined as the absence of conduct imbued with elements of "moral turpitude." (*Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452 [55 Cal.Rptr. 228, 421 P.2d 76]; *Hightower* v. *State Bar* (1983) 34 Cal.3d 150, 157 [193 Cal.Rptr. 153, 666 P.2d 10].) It includes "qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the laws of the state and the nation and respect for the rights of others and for the judicial process." (Rules Regulating the Admission to Practice Law, rule X, § 1; *Kwasnik* v. *State Bar, supra,* 50 Cal.3d at p. 1067; *Pacheco* v. *State Bar* (1987) 43 Cal.3d 1041, 1046 [239 Cal.Rptr. 897, 741 P.2d 1138].)

In a moral character proceeding, the applicant must first establish a prima facie case that he or she possesses good moral character; the State Bar may then rebut that showing with evidence of bad moral character. If it does so, the burden then shifts back to the applicant to demonstrate his or her rehabilitation. (*Lubetzky* v. *State Bar, supra,* 54 Cal.3d at p. 312; *Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d at pp. 449-551, fn. 1.) ▌ Although we give "great weight" to the findings of the hearing panel on review, they are not binding on this court. "We examine the evidence and make our own determination as to its sufficiency . . . ." (*Hightower* v. *State Bar, supra,* 34 Cal.3d at pp. 155-156; see also *Lubetzky* v. *State Bar, supra,* 54 Cal.3d at p. 312.)

Although the foregoing standards are well settled, we confront two relatively novel claims at the threshold of this matter. The first concerns the respective roles of the Committee and the State Bar Court. This petition is the first granted pursuant to California Rules of Court, rule 952.6, which provides the Committee of Bar Examiners may petition this court for review of decisions by the Review Department of the State Bar Court in moral character proceedings. Formerly, moral character hearings were held before a subcommittee of the Committee of Bar Examiners, and adverse decisions were appealable to the full Committee. (See, e.g., *Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730 [159 Cal.Rptr. 848, 602 P.2d 768].) Since motions for admission were within the exclusive purview of the Committee, no potential for inconsistent determinations arose. Even after the Committee began submitting contested matters to the State Bar Court for resolution (see, e.g., *Kwasnik* v. *State Bar, supra,* 50 Cal.3d at pp. 1066-1067), conflicts between the two bodies were apparently rare, and the rules contain no formal dispute resolution procedure.

The adjudication of admission and disciplinary matters changed with the creation of the professional State Bar Court in 1988 (Bus. & Prof. Code, § 6079.1) and the adoption of certain complementary rules of procedure. Pursuant to rule 836, Transitional Rules of Procedure of the State Bar Court [(Deering's Cal.Rules of Court (State Bar) (1988 ed., 1995 cum. supp.) pp. 80-81)], decisions of the State Bar Court are now deemed to be conclusive on both the applicant and the Committee. However, under rule 952.6, California Rules of Court, the Committee may petition this court for review of those decisions on grounds set forth in California Rules of Court, rule 954(a).[2]

The question is raised whether the relative relation of the Committee and the State Bar Court has changed under the new system. The Committee

---

[2]Rule 954(a), of the California Rules of Court provides that this court will order review of a decision of the State Bar Court when it appears "(1) necessary to settle important questions of law; (2) the State Bar Court has acted without or in excess of jurisdiction; (3) petitioner did

asserts its assessment of moral fitness is entitled to greater weight than the State Bar Court's decision because it retains the sole statutory authority to certify applicants for admission to this court. (Bus. & Prof. Code, §§ 6046, 6064.) The argument is inapt. The Committee and the State Bar Court each perform a critical role in the assessment of an applicant's moral character. The Committee conducts the initial review and evaluation of a candidate's moral character application, administers the investigation when further inquiry and analysis are required, and may meet informally with the applicant to receive written or oral statements and review documentary evidence. (Rules Regulating Admission to Practice Law, rule X.) An applicant who receives an adverse moral character assessment from the Committee may then appeal that determination to the State Bar Court for a formal evidentiary hearing and review. (*Ibid.*)

The findings of the hearing panel have long been accorded significant weight, inasmuch as the hearing judge is in the best position to weigh intangibles such as credibility and demeanor. (*Rodgers* v. *State Bar* (1989) 48 Cal.3d 300, 312 [256 Cal.Rptr. 381, 768 P.2d 1058].) This principle applies equally under the professional State Bar Court system. Nonetheless, the Committee of Bar Examiners retains the sole statutory authority to administer the requirements for admission to the bar and to certify to this court those applicants who satisfy the requirements. (Bus. & Prof. Code, §§ 6046, 6064.) The new rules continue to recognize the Committee's special expertise and authority in this area by providing that the decision of the State Bar Court is merely provisional; the Committee may concur in that decision, in which case it becomes final after the period for review has expired, or it may affirmatively challenge the State Bar Court's ruling, in which case it becomes conclusive only after this court has either granted or denied review. (Transitional Rules Proc. of State Bar Court, rule 836.)

Thus, the determinations of both the Committee and the State Bar Court as to moral fitness play an integral role in the ultimate decision by this court whether to admit an individual to the practice of law, and both are entitled to substantial weight within their respective spheres. Neither, however, is ultimately binding. "[W]e independently examine and weigh the evidence and pass on its sufficiency." (*Pacheco* v. *State Bar*, *supra*, 43 Cal.3d at p. 1047.)

The Committee raises a second issue relating to the evidentiary standards to be applied to those, such as applicant, who have been previously disbarred in other states. As noted, the burden is on the applicant to prove his

---

not receive a fair hearing; (4) the decision is not supported by the weight of the evidence; or (5) the recommended discipline is not appropriate in light of the record as a whole."

or her good moral character. (Rules Regulating Admission to Practice Law, rule X, § 1; *Pacheco* v. *State Bar*, *supra*, 43 Cal.3d at p. 1046.) Once the applicant furnishes sufficient evidence of good moral character to establish a prima facie case, the burden shifts to the bar to rebut that showing with evidence of bad moral character. (*Seide* v. *Committee of Bar Examiners* (1989) 49 Cal.3d 933, 937-938 [264 Cal.Rptr. 361, 782 P.2d 602].) When the bar proffers evidence of prior acts of moral turpitude, the applicant must then demonstrate that he or she is fully rehabilitated and currently possesses the moral qualifications to be a member of the bar. (*Id.* at p. 937.) All reasonable doubts are generally resolved in the applicant's favor. (*Ibid.*)

When, as here, an applicant has been previously disbarred in another state, the Committee argues the situation is analogous to a disbarred California attorney seeking reinstatement, in which case the applicant "bears a heavy burden of proving rehabilitation." (*Hippard* v. *State Bar* (1989) 49 Cal.3d 1084, 1091 [264 Cal.Rptr. 684, 782 P.2d 1140].) We have held the burden of proof of good moral character is substantially more rigorous for an attorney seeking reinstatement than for a first time applicant. "The person seeking reinstatement after disbarment is required to adduce stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, although an application for reinstatement is treated by this court as a proceeding for admission, the proof presented must be sufficient to overcome our prior adverse judgment . . . ." (*Calaway* v. *State Bar* (1986) 41 Cal.3d 743, 745-746 [225 Cal.Rptr. 267, 716 P.2d 371].) Thus, an applicant for reinstatement "must show by the most clear and convincing evidence that efforts made towards rehabilitation have been successful." (*Hippard* v. *State Bar*, *supra*, 49 Cal.3d at p. 1092.) We agree with the Committee that applicant, having been disbarred in another state, stands in essentially identical circumstances to a disbarred California attorney seeking reinstatement, and the evidence of rehabilitation should therefore be evaluated under the same rigorous standards.

In a similar vein, the Committee urges that, having been previously disbarred, applicant is not entitled to have "all reasonable doubts" resolved in his favor. (*Seide* v. *Committee of Bar Examiners*, *supra*, 49 Cal.3d at p. 937.) Again, we agree that under the circumstances he is not entitled to the benefit of the doubt if "equally reasonable inferences may be drawn from a proven fact." (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993].)

Both the hearing department and the review panel of the State Bar Court evaluated the evidence of rehabilitation under a heightened "clear and

convincing" standard, which applicant concedes was proper. The real dispute is whether the evidence supports the State Bar Court's determination he met that standard. As for resolving conflicting inferences, the record evidence is relatively straightforward and leaves little need for such analysis.

### 2. *The evidence does not warrant admission*

It is generally undisputed applicant established through extensive testimony and numerous written testimonials—including a number of California attorneys—a prima facie case he currently possesses good moral character. (See *Lubetzky* v. *State Bar*, *supra*, 54 Cal.3d at p. 315, fn. 3 ["Our decisions in admission cases accord 'significant weight' in making a prima facie case to testimonials from attorneys on an applicant's behalf."].) It is also undisputed the Committee effectively rebutted applicant's showing through uncontested proof of his previous professional misconduct, criminal convictions, and permanent disbarment from the practice of law in New Jersey. The issue thus resolves to the sufficiency of his showing of rehabilitation.

As Chief Justice Lucas has observed, "The amount of evidence of rehabilitation required to justify admission varies according to the seriousness of the misconduct at issue." (*Kwasnik* v. *State Bar*, *supra*, 50 Cal.3d 1061, 1086 (dis. opn. of Lucas, C. J.).) Indeed, in light of the seriousness of applicant's prior misconduct, the review department here noted that he "had a very high hill to climb in proving his rehabilitation." Specifically, it observed "[applicant's] heavy indebtedness was due to prior, extremely serious, criminal misconduct in the practice of law, injuring his clients and others because of his gambling addiction. Also, . . . it was not the result of an isolated incident, but [of] repeated criminal acts over a period in excess of three years." As summarized previously, applicant engaged in a protracted course of wilful misconduct during which time he misappropriated the trust funds of 19 separate clients, abused his fiduciary trust in obtaining a large loan from an elderly client, attempted to manufacture methamphetamine to offset his mounting indebtedness, and wilfully failed to file a New Jersey state income tax return. He pled guilty to four felony counts, served time in prison and a halfway house, and was disbarred from the practice of law there. By his own admission he is permanently barred from applying for readmission in New Jersey. In addition, applicant still owes $25,000 to his former law firm, $95,000 to Mrs. Cruice, over $120,000 to the bank that reimbursed the New Jersey Client Security Fund, and more than $535,000 to the Internal Revenue Service in tax liabilities and penalties.

As evidence of his rehabilitation, applicant submitted substantial evidence his previous misconduct resulted from a gambling addiction he has successfully overcome. The undisputed evidence that applicant has not gambled

since 1982 and has participated regularly as a member and officer of Gamblers Anonymous since 1983, the laudatory testimonials from numerous friends and fellow members of Gamblers Anonymous attesting to his full recovery, and the expert testimony of two of his treating psychologists amply support the conclusion applicant has recovered from his compulsive gambling. As we have observed, "An alcoholic's rehabilitation is almost universally predicated on a choice to confront his or her problem, followed by abstinence sustained through ongoing participation in a supportive program, such as Alcoholics Anonymous." (*In re Billings* (1990) 50 Cal.3d 358, 368 [267 Cal.Rptr. 319, 787 P.2d 617].)

We have also long recognized that testimonials from acquaintances, friends and employers with reference to their observation of the daily conduct of an attorney who has been disbarred are entitled to "great weight." (*Hippard* v. *State Bar*, *supra*, 49 Cal.3d at p. 1095; see also *In re Gaffney* (1946) 28 Cal.2d 761, 764 [171 P.2d 873].) We give particular credence to such statements by attorneys, based on the notion that such persons "possess a [keen] sense of responsibility for the integrity of the legal profession." (*Warbasse* v. *The State Bar* (1933) 219 Cal. 566, 571 [28 P.2d 19]; see also *Pacheco* v. *State Bar*, *supra*, 43 Cal.3d at p. 1053; *Lubetzky* v. *State Bar*, *supra*, 54 Cal.3d at p. 315, fn. 3; *Kwasnik* v. *State Bar*, *supra*, 50 Cal.3d at p. 1068.) Applicant presented over 25 letters from attorneys, friends, and fellow employees, as well as the testimony of 4 California attorneys. Despite knowing of his previous misdeeds, all attested to his good moral character, honesty, and responsibility and recommended his admission to the bar.

Although the evidence of applicant's recovery from compulsive gambling is substantial and the testimonials on his behalf are impressive, we are nevertheless not persuaded he has demonstrated his overall rehabilitation by clear and convincing evidence. ■ While undoubtedly relevant, "character testimony, however laudatory" does not alone establish the "requisite rehabilitation." (*In re Petty* (1981) 29 Cal.3d 356, 362 [173 Cal.Rptr. 461, 627 P.2d 191]; see also *Seide* v. *Committee of Bar Examiners*, *supra*, 49 Cal.3d at p. 939.) Nor, when weighed against the enormity of his previous misconduct, does applicant's apparent recovery from a gambling addiction necessarily justify his admission.

We have long held in reinstatement cases that " 'the evidence of present character must be considered in the light of the moral shortcomings which resulted in the imposition of discipline.' " (*Tardiff* v. *State Bar* (1980) 27 Cal.3d 395, 403 [165 Cal.Rptr. 829, 612 P.2d 919], quoting *Roth* v. *State Bar* (1953) 40 Cal.2d 307, 313 [253 P.2d 969]; see also *Kwasnik* v. *State Bar*, *supra*, 50 Cal.3d 1061, 1086 (dis. opn. of Lucas, C. J.).) ■ Applicant's

repeated thefts of client funds over several years represent "a continuing course of serious professional misconduct." (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 576 [119 Cal.Rptr. 335, 531 P.2d 1119].) He violated " ' "the fundamental rule of [legal] ethics—that of common honesty—without which the profession is worse than valueless in the place it holds in the administration of justice" . . . .' " (*Rhodes* v. *State Bar* (1989) 49 Cal.3d 50, 60 [260 Cal.Rptr. 266, 775 P.2d 1035].) His conviction for manufacturing methamphetamine involved an act of moral turpitude, which alone has been held to be sufficient to deny admission to the bar (*Seide* v. *Committee of Bar Examiners*, *supra*, 49 Cal.3d 933); and his wilful failure to file an income tax return evinces a disrespect for law that further refutes his fitness to practice. (*In re Rohan* (1978) 21 Cal.3d 195, 203-204 [145 Cal.Rptr. 855, 578 P.2d 102].)

Applicant's previous misconduct was sufficiently egregious to warrant the ultimate sanction of his permanent disbarment in New Jersey. It is not unreasonable, therefore, to require a truly compelling demonstration of moral rehabilitation as a condition of his admission to the bar of this state, i.e., " ' "overwhelming[] proof of reform . . . which we could with confidence lay before the world in justification of a judgment again installing him in the profession. . . ." ' " (*Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 547 [248 P.2d 3], quoting *In re Morganstern* (1927) 85 Cal.App. 113, 117 [259 P. 90].) The record evidence does not satisfy this standard.

In our judgment, such "overwhelming" proof must include at a minimum a lengthy period of not only unblemished, but exemplary conduct. The State Bar Court credited applicant with nine years of good conduct, measured from his last act of misconduct in 1983 to the time of his hearing in 1992. However, he was in prison and a halfway house for a portion of that time and did not successfully complete his parole until the spring of 1987. Good conduct is normally demanded of a prisoner and a parolee. (See *Seide* v. *Committee of Bar Examiners*, *supra*, 49 Cal.3d at p. 939 ["It is not enough that petitioner kept out of trouble while being watched on probation; he must affirmatively demonstrate over a prolonged period his sincere regret and rehabilitation."]; *In re Giddens* (1981) 30 Cal.3d 110, 116 [177 Cal.Rptr. 673, 635 P.2d 166] [requiring further proof of rehabilitation "during a period when petitioner is neither on parole . . . nor under supervision of the bar."].) Considering that applicant's compulsive gambling began in 1978, shortly after his admission to the New Jersey bar, and that he engaged in a continuous course of professional and criminal misconduct for a period of five years ending only with his arrest in 1983, his five and one-half years of unsupervised good conduct is not a sufficient period of time to demonstrate genuine reform. (See *Seide* v. *Committee of Bar Examiners*, *supra*, 49 Cal.3d at p. 939.)

Nor, in our view, does the record show applicant has engaged in truly exemplary conduct in the sense of returning something to the community he betrayed. Applicant's participation in Gamblers Anonymous and his efforts to help others deal with their addiction is commendable, even if somewhat mitigated by the personal benefit of helping to maintain his own recovery. More significantly, he has made almost no "effort to aid those upon whom he specifically preyed" (*Seide* v. *Committee of Bar Examiners*, *supra*, 49 Cal.3d at p. 941, fn. 6), namely, the individuals and institutions whose moneys (totaling over $270,000) he stole and whose trust he violated. He contacted Mrs. Cruice and the Maressa law firm after his release from prison, but never arranged for repayment. He made a number of installment payments to the Midatlantic Bank of New Jersey (in an unknown amount); however, these ceased when his construction company went out of business in 1988. Based on the record, the hearing department concluded applicant had "failed to make a sufficient factual showing of an inability to make at least partial restitution, or an objectively verifiable effort to make restitution reasonably related to his ability to pay."

■ While restitution "is not necessarily determinative of whether rehabilitation has been proven," it is a legitimate and substantial factor to be considered "in the overall factual showing made by the individual seeking reinstatement." (*Hippard* v. *State Bar*, *supra*, 49 Cal.3d at p. 1093 [denying application for reinstatement based in part upon petitioner's failure to demonstrate a meaningful attempt to make restitution or an inability to do so].) Notwithstanding the discharge in bankruptcy of applicant's debts resulting from his misappropriation of client funds, we may properly consider the relative absence of any serious effort to make even partial restitution "as an indicator of rehabilitation." (*Id.* at p. 1094; *Kwasnik* v. *State Bar*, *supra*, 50 Cal.3d at p. 1072.) Furthermore, applicant stipulated that although they were discharged in bankruptcy, "it is his intention to make restitution on these debts." Actions speak louder than words. Sustained exemplary conduct must include proof applicant is making amends to the victims and the community he harmed.[3]

■ Finally, applicant presented substantial evidence of his genuine remorse for the harm he caused his former clients and law firm and the

---

[3]The Review Department of the State Bar Court appeared to question the evidentiary basis of the hearing department's finding applicant had not demonstrated an inability to make restitution, noting applicant's annual gross income from 1985 through 1989 was generally under $12,000. However, ability to pay is essentially irrelevant to whether he has met his burden on the question of rehabilitation. Absent a serious attempt to make restitution in any amounts, applicant simply has not established the necessary moral fitness for admission. The record provides no basis for excusing that deficiency; however, we would require any explanation be of the most compelling order.

disrepute he brought on the legal community in which he practiced. Applicant testified he hoped to become a "productive member of society" again and provide assistance to those who "need help in the legal system." The hearing department found he testified in this regard "with notable credibility and sincerity." We do not question the hearing department's finding or the genuineness of applicant's sincerity. ■ However, "[r]emorse does not demonstrate rehabilitation. . . . In our view, a truer indication of rehabilitation will be presented if petitioner can demonstrate by his sustained conduct over an extended period of time that he is once again fit to practice law. . . ." (*In re Conflenti* (1981) 29 Cal.3d 120, 124-125 [172 Cal.Rptr. 203, 624 P.2d 253]; accord, *In re Schwartz* (1982) 31 Cal.3d 395, 401 [182 Cal.Rptr. 640, 644 P.2d 833, 26 A.L.R.4th 1077 ].) If applicant is committed to assisting those who "need help in the legal system," opportunities are available such as providing pro bono or volunteer work as well as other nonlegal means of contributing as a "productive member of society."

CONCLUSION

In seeking admission to practice law in this state, applicant assumes a most substantial burden on the question of his moral fitness. Although we do not disregard his recovery from compulsive gambling and the absence of further criminal conduct, the fact remains he has paid very little, monetary or otherwise, on his debt to his victims and to society for the acts of moral turpitude committed while a member of the New Jersey bar. In light of the extremely serious nature of his prior misconduct and discipline as well as his failure to make meaningful restitution to his many victims, we cannot conclude he has established the requisite good moral character.

We therefore reject the recommendation of the State Bar Court and decline to admit applicant to the practice of law.